Markman, J.
(dissenting). I respectfully dissent and would reverse defendant’s convictions and remand for a new trial. I believe that the trial court seriously erred in relying on the rape-shield statute to preclude defendant from introducing evidence concerning past sexual abuse of the complainant. As a result, the jury was presented with an incomplete and distorted picture of what had occurred, the truth-seeking process of the criminal justice system was compromised, and defendant, in my judgment, was denied a fair trial. By denying leave to appeal, this Court upholds defendant’s convictions while depriving him of substantial relevant evidence with which to defend himself.
I. HISTORY
A jury convicted defendant of two counts of first-degree criminal sexual conduct (CSC-1) pursuant to MCL 750.520b(l)(a) (sexual penetration with a person under 13 years of age). The charges arose out of two alleged incidents with defendant’s stepdaughter, complainant DW On the first day of trial, the prosecutor requested a ruling by the court to *1058 prohibit defense questioning regarding any previous allegations made by DW of sexual abuse.[1] The trial court determined that such testimony would be contrary to- the rape-shield statute and ruled that defendant could not elicit such testimony.
During trial, DW testified that defendant performed certain acts with her. She described sexual acts that a child of her age — nine years old — typically would not have knowledge of or be able to describe. Despite this testimony, defendant was prohibited from introducing evidence that DW could have learned about such acts not only from DW’s alleged abuse, but also from the abuse alleged against her step-grandfather. Dr. Stephen Guertin, the medical doctor who examined DW after her allegations against her step-grandfather, and also after her allegations against defendant, testified that DW’s history led him to believe that she had been abused. Defendant, however, was again not allowed to explore DW’s past allegations and how the conduct that was the subject of these allegations might have affected Dr. Guertin’s opinion.
The jury subsequently convicted defendant on both counts of CSC-1, and the Court of Appeals affirmed. People v Parks, unpublished opinion per curiam of the Court of Appeals, issued May 18, 2004 (Docket No. 244553). We held defendant’s application for leave to appeal in abeyance, pending our decision in People v Jackson, 477 Mich 1019 (2007). In Jackson we held that “testimony concerning prior false allegations does not implicate the rape-shield statute.” Id. We remanded this case to the trial court to afford “the defendant the opportunity to offer proof that the complainant made a prior false accusation of sexual abuse against another person.” 478 Mich 910 (2007).
The trial court held an evidentiary hearing in accordance with our remand order. The testimony provided a glimpse of DW’s life leading up to the present allegations against defendant. DW spent the first four years of her life living with her mother, Terry, and her grandmother and step-grandfather in Missouri. During that time, when DW was around three years old, she fell off a golf cart and suffered a closed head injury. The injury has affected DW’s development, and she still receives medical treatment, including drug treatment, in order to limit seizures caused by the injury.
In 1995, when DW was four years old, Terry, who was then pregnant, moved with DW to Michigan, where they met defendant, who began living with them. Terry and defendant married and had a child of their own. During this period, DW begem acting out in various sexual ways, all of which were inappropriate for a child of her age. When asked why she was behaving in such a manner, DW described certain occasions on which her step-grandfather had allegedly abused her.[2]
Terry and defendant sought help in connection with DW’s edlegations against her step-grandfather, including contacting the Family Indepen *1059 dence Agency (FLA). During DW’s interview with the FIA, she did not disclose any past abuse by her step-grandfather. The FIA, however, referred DW to Dr. Guertin for an examination.
In 1996, Dr. Guertin examined DW with respect to the allegations about her step-grandfather, but he did not find any physical manifestation of the molestation. DW also did not disclose to Dr. Guertin abuse by her step-grandfather. Defendant and Terry were unable to pursue the allegations any further.
In 1998, Terry left with her three children, including DW Shortly thereafter, defendant received a call from a police officer in Oregon, inquiring about the children. Terry had apparently been charged with drug offenses, and the children were at risk of being placed in foster care. Defendant arranged for the children to come live with him, which they did in early 1999. Around that same time, defendant began living with Julie Sutliff. Sutliff testified at the evidentiary hearing that DW exhibited sexually inappropriate behavior, and when Sutliff asked DW about her behavior, DW told Sutliff about the incidents with her step-grandfather.
The trial court determined that DW’s past allegations of abuse by her step-grandfather were not “false” and thus remained within the scope of the rape-shield statute. Defendant again sought leave to appeal in this Court, and we heard oral argument regarding, among other things, whether DW’s allegations against her step-grandfather are inadmissible on the basis of the rape-shield statute. 481 Mich 860.
II. RAPE-SHIELD STATUTE
The rape-shield statute, MCL 750.520j, reads in part:
(1) Evidence of specific instances of the victim’s sexual conduct, opinion evidence of the victim’s sexual conduct, and reputation evidence of the victim’s sexual conduct shall not be admitted under sections [MCL 760.520b to 750.520g] unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:
(a) Evidence of the victim’s past sexual conduct with the actor.
(b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.
This statute only excludes evidence of the “victim’s sexual conduct.” Thus, any inquiry into the statute’s application must focus on the meaning of “conduct.” The ordinary meaning of “conduct” is harmonious with the Legislature’s use of “conduct” throughout the enacting legislation, 1974 PA *1060 266,[3] and with the Legislature’s purposes in enacting the rape-shield statute. Each of these interpretative guides strongly suggests that “conduct” refers only to volitional actions by the victim and does not encompass involuntary acts such as those that stem from being subjected to sexual abuse.
The definition of “conduct” varies little from dictionary to dictionary. Conduct is defined as: “personal behavior; way of acting; deportment,” Random House Webster’s College Dictionary (1997); “[t]he way a person acts; behavior,” The American Heritage Dictionary of the English Language (1981); and “[t]he manner of guiding or carrying one’s self; personal deportment; mode of action; behavior,” Webster’s Revised Unabridged Dictionary (1996). The common theme of these definitions is that “conduct” pertains to an individual’s own behavior, to actions initiated or set in motion by the individual. Being the victim of, or having been subjected to, sexual abuse by another does not by this definition of “conduct” constitute something within the scope of the rape-shield statute, and therefore should not be excluded from evidence under the authority of this statute.
This interpretation of “conduct” is further supported by the Legislature’s use of “conduct” throughout the rape-shield statute. If “conduct” is read to include abuse perpetrated against the victim by other persons, then references in the statute, MCL 750.520j(1), to “opinion evidence of the victim’s sexual conduct” and “reputation evidence of the victim’s sexual conduct” make no sense. Reputation and opinion evidence are typically based on a person’s character, such as the person’s tendency for aggression.[4] A person’s character and conduct are similar at least in the sense that they are each formed by voluntary decisions made by that individual. Actions concerning which an individual has no control cannot be said to establish a person’s character, so when the Legislature extended protection from reputation and opinion evidence in MCL 750.520j(1), it likely understood that such evidence could only apply with respect to a victim’s sexual history over which the victim has control. Thus, the ordinary volitional understanding of “conduct” also fits within the context in which it is used in the rape-shield statute, whereas a broader definition, encompassing non-volitional behavior, including sexual abuse by others, does not.
The statute provides additional insight on the meaning of “conduct” by distinguishing “conduct” from “activity” in paragraphs (a) and (b) of MCL 750.520j(1). These paragraphs set forth two exceptions to the general inadmissibility of evidence regarding a “victim’s sexual conduct” in subsection (1). Paragraph (a) renders admissible evidence of the “victim’s past sexual conduct with the actor,” and paragraph (b) renders admissible “specific instances of sexual activity" concerning the “source or origin of semen, pregnancy, or disease.” “Activity” does not connote the concept of *1061 volition to the same extent as “conduct.” “Activity” in paragraph (b) pertains to conditions that directly result from the physical sex act itself — semen, pregnancy, disease — in which the concept of volition is essentially irrelevant. In contrast, “conduct” in paragraph (a) pertains to a range of interpersonal behavior that extends beyond the physical act itself, and in which the concept of volition may be quite relevant in assessing whether the victim chose to behave in such a way that the defendant should be deemed less culpable, or not culpable at all, for the alleged offense. Interpreting “conduct” to include non-volitional action blurs the Legislature’s apparently careful distinction between “conduct” and “activity.”
The Legislature’s use of “conduct” throughout 1974 PA 266 further supports interpreting “conduct” to include only volitional actions. See, e.g., MCL 750.520b (describing first-degree criminal sexual “conduct”). It seems unlikely that the Legislature intended to punish non-volitional activity under the criminal code. Interpreting “conduct” to mean only volitional action maintains this understanding. “Identical language should receive identical construction when found in the same act.” People ex rel Simmons v Munising Twp, 213 Mich 629, 633 (1921).
Further uses of “conduct” in 1974 PA 266 are found in MCL 750.520a, in which the Legislature defined “actor” as “a person accused of criminal sexual conduct,” MCL 750.520a(a), and “victim” as “the person alleging to have been subjected to criminal sexual conduct,” MCL 750.520a(s). These definitions distinguish a person who has chosen to perform a certain act from one who had no choice in performing such act. If a victim, for example, is raped by an actor, the rape is considered to be the actor’s conduct. The victim is considered to have been “subjected to” the conduct, strongly suggesting that rape is not fairly characterized as the victim’s conduct.[5] Rather, it would only be the “conduct” of the person who chose to perform the act.[6]
The overall purpose of the rape-shield statute also supports understanding “conduct” by its normal definition to encompass only volitional activity. MCL 750.520j was clearly enacted to prevent the introduction of embarrass *1062 ing evidence regarding the victim’s sexual history at trial.[7] Such prohibition, it was hoped, would increase the likelihood that sexual assault victims would report such assaults and not be deterred from doing so by the prospect of embarrassment. Yet, reading the rape-shield statute to exclude evidence regarding past abuse suffered by the victim bears no apparent relationship to this purpose. While any person may well be uncomfortable about revealing past instances in which he or she was sexually abused, such uneasiness is sharply distinct from the kind of embarrassment that rape-shield statutes were designed to foreclose — embarrassment caused as a function of one’s own misbehavior or questionable conduct.[8]
By enacting the rape-shield statute, the Legislature also sought to eliminate the potential for a defendant to exploit a victim’s sexual history to imply consent in the defendant’s case.[9] What is at issue in this case — the admissibility of evidence that the victim was previously abused by a person other than the defendant — cannot be similarly exploited by the defendant.
III. “SEXUAL CONDUCT”
With the understanding that the rape-shield statute only applies to volitional acts, evidence regarding DW’s allegations against her step-grandfather does not qualify for exclusion as “the victim’s past sexual conduct.” The testimony at the evidentiary hearing indicates that DW’s step-grandfather may have “subjected” her to various sexual acts, none of which DW chose to perform. Accordingly, defendant should have been allowed to present evidence regarding this past sexual abuse.[10]
Because of the trial court’s erroneous interpretation of the rape-shield statute, rather than the jury basing its decision regarding defendant’s *1063 guilt on all the relevant information, the jury was forced to make assumptions based on incomplete information. In particular, in order to confront the unsettling fact that DW was able at nine years of age to describe certain sex acts she alleged defendant had performed on her, the jury was more likely to conclude that defendant actually had performed those acts. The jury was not allowed to hear and evaluate an alternative explanation that DW may have learned about such acts not from defendant, but from her step-grandfather. If the jury had been apprised of DW’s allegations of previous abuse, it may well have come up with a different explanation concerning the source of DW’s precocious sexual knowledge and thereby reached a different conclusion regarding defendant’s guilt.[11]
Equally troubling is the void left by Dr. Guertin’s testimony. Dr. Guertin testified that he had examined DW in 1996, but the jury received no information regarding what prompted that examination. Instead, Dr. Guertin testified that during his most recent examination of DW, which followed in time the present allegations against defendant, he discerned no physical signs of abuse but concluded on the basis of DW’s history that she had been sexually abused.[12] The trial court then instructed the jury not to consider the 1996 examination as relevant to the instant charges. As a result, the jury heard that DW had likely suffered abuse and was aware of only one possible source of that abuse — defendant. Thus, by improperly expanding the purview of the rape-shield statute, the trial court left the jury with a distorted picture of defendant’s potential role in previously abusing DW Defendant had no way of presenting evidence that DW’s history potentially included abuse by another individual. The court’s limitation on Dr. Guertin’s testimony unfairly subjected defendant to a process in which the jury heard evidence suggesting his guilt, but did not hear any testimony by defendant with which he could dispel this suggestion.
IV RESPONSE TO CONCURRENCE
(1) The concurring justice asserts that the interpretation of MCL *1064 750.520j set forth in this dissent would “give rape victims fewer privacy interests than prostitutes under the rape-shield statute.” Ante at 1040. Although an attention-getting observation, I fail to see how this is either relevant or true. The rape-shield statute bars evidence of volitional sexual behavior, regardless of whether the complainant is a prostitute, a rape victim, or any other person, whatever the complainant’s gender, profession, race, color, creed, lifestyle, or history of sexual promiscuity. Evidence of volitional sexual behavior is barred with regard to all complainants. Similarly, all complainants are treated exactly the same with regard to non-volitional sexual behavior.
(2) The concurring justice states that defendant’s “failure to preserve the appropriate claim of error is, by itself, a sufficient — and [his] primary — basis for denial.” Ante at 1043. Yet, defendant did preserve his claim of error by arguing before the trial court that DW’s allegations should not be precluded by the statute. In any event, as the concurring justice himself has stated, “addressing a controlling legal issue despite the failure of the parties to properly frame the issue is a well understood judicial principle.” Mack v Detroit, 467 Mich 186, 207 (2002) (Young, J.). A majority of this Court has already held that defendant’s claim of error warranted a hearing by the trial court regarding the falsity of DW’s allegations. Now that the trial court has determined that the allegations were not false, the controlling issue is whether the preclusion of evidence was proper in that it constituted the victim’s “sexual conduct.” Where a defendant’s guilt, and resultant exposure to a sentence of imprisonment for life, potentially rests entirely upon the interpretation of a statute, I believe this Court should “set forth the law as clearly as it can, irrespective of whether the parties assist the Court in fulfilling its constitutional function.” Id. at 209.
(3) The concurring justice also contends that my “understanding of the term ‘conduct’ artificially restricts the term to voluntary behavior.” Ante at 1044.1 fail to see how using an ordinary definition of an ordinary term injects anything “artificial” into the interpretative process. The beginning point of statutory interpretation is to understand what the Legislature intended by its use of a word in context. Indeed, the concurring justice seems to agree with such an approach when he concludes that the “longstanding definition” of “conduct” is “personal behavior.” Ante at 1044 n 14. Yet, he never addresses what this definition means in the context of the victim’s “sexual conduct.” Instead, he concludes that “conduct” can encompass “both voluntary behavior and involuntary behavior,” ante at 1044, and, to support this conclusion, relies on a single, stray reference to “conduct” set forth in a decision predating the rape-shield statute by 64 years, having nothing to do with the meaning of “conduct,” and relating in not the slightest way to rape or sexual behavior of any kind. Ante at 1044-1045 n 15. Quite apart from the fact that it is “conduct,” not “personal behavior,” that is the subject of interpretation here, the concurring justice’s invocation of “personal behavior” in support of his position disregards that this latter term also describes the manner in which a person acts under his or her own will. For example, if asked to describe a person’s “driving behavior,” or more specifically his or her “personal driving behavior,” a response might *1065 typically reference how fast that person chooses to drive or how that person interacts with other drivers on the road. On the other hand, "personal driving behavior” would not typically refer to a person having been rear-ended at a stop light or having been cut off by another driver. Similarly, a person’s “personal sexual behavior” might typically refer to that person’s promiscuity or lack thereof, or to his or her sexual preferences or inclinations. It would not, however, typically refer to instances of sexual abuse against that person in which he or she had no control.
(4) The concurring justice argues that, although the initial bill included the phrase “consensual sexual activity,” the bill actually enacted included an amendment “that deleted the word ‘consensual.’ ” Ante at 1045. This argument fails to recognize that the amendment, in fact, replaced “consensual sexual activity” with “sexual conduct,” rather than merely deleting the word “consensual.” If anything, this amendment suggests that the Legislature considered “conduct” to be an altogether suitable substitute for “consensual activity.”
(5) The concurring justice’s citation of People v Arenda, 416 Mich 1 (1982), has little bearing on the present issue because the defendant in that case did not raise any argument regarding the meaning of “conduct,” and the Court did not address this issue at all. Ante at 1046. Instead, Arenda focused exclusively on the constitutionality of the rape-shield statute and never explored the meaning of a victim’s “sexual conduct.”
(6) The concurring justice would require the defendant to demonstrate that “another person was convicted of criminal sexual conduct (CSC) involving the complainant” before being allowed to reference DW’s past allegations. Ante at 1051 (emphasis omitted), citing People v Morse, 231 Mich App 424 (1998). Again, I disagree. First, Morse only applies to “conduct” barred by the rape-shield statute and DW’s prior allegations do not constitute “conduct.” Second, the jury was allowed to hear Dr. Guertin’s testimony, which was influenced by DW’s prior allegations, even though her step-grandfather was never convicted of CSC. Defendant was denied an opportunity to explore those same allegations. Requiring defendant to first show that a CSC conviction arose out of the allegations would subject defendant to a burden higher than that of the prosecutor as a precondition to presenting evidence to the jury.
(7) Finally, the concurring justice states that the Legislature “has determined that the fact that a complainant had been abused in the past is simply irrelevant to her present credibility.” Ante at 1050. Here, however, it is not the abuse, but the allegations of such abuse, that go to DW’s credibility because she testified at the preliminary hearing that she never made any previous allegations. Further, although the concurring justice acknowledges that such past allegations may be important in "explaining D.W.’s age-inappropriate sexual knowledge and behavior,” ante at 1050, he overlooks the importance of these allegations in also explaining Dr. Guertin’s testimony. Dr. Guertin told the jury that he had concluded, based on DW’s history, that DW had likely been abused. The jury, however, had no way of knowing that DW’s “history” included allegations of past abuse and that these allegations, rather than any *1066 conduct by defendant, may have contributed to Dr. Guertin’s conclusion.[13] Allowing defendant to be convicted with such incomplete information seriously affects the integrity of the trial process and compromises its truth-seeking mission.
V CONCLUSION
For these reasons, I would remand for a new trial. Defendant should be allowed the opportunity to present evidence regarding DW’s allegations against her step-grandfather and their relevance to the charges against defendant.
CAVANAGH, J. I join the statement of Justice Markman.

 Prior to her allegations against defendant, DW had alleged that her step-grandfather sexually abused her.

 DW told defendant that her step-grandfather had touched her vagina and put his penis in her mouth. The language DW used in relating this *1059 abuse is similar to the language she used to describe the alleged acts by defendant and demonstrated sexual knowledge clearly inappropriate for a four- to five-year-old child.

 This amended the criminal code with comprehensive legislation covering criminal sexual conduct (CSC). MCL 750.520a et seq.

 This Court recognized that “sexual reputation,” when presented to show that the victim consented, is “simply a variation of character evidence.” People v Hackett, 421 Mich 338, 348 (1985).

 I disagree with the concurring justice who states that a victim "take[s] part in” the sexual abuse to which he or she is subjected. Ante at 1045. A person who is forced to endure such abuse, or may not even be aware of it (e.g., where the victim is sleeping or unconscious), cannot in normal parlance be said to have “take[n] part in” such act.

 Still further support is provided by the Legislature’s definitions of “mentally incapable” and “mentally incapacitated” in MCL 750.520a. The definitions refer to mental illness and altering substances that “renderf] [a person] incapable of appraising the nature of his or her conduct.” MCL 750.520a(i); see MCL 750.520a(j) (using language only slightly different from MCL 750.520a[i]). Here, “conduct” also retains its essence that an activity be volitional, because the gist of the definitions is that the person can no longer control his or her actions because of mental illness or the influence of drugs.

 This Court has observed that MCL 750.520j(l) was enacted to encourage victims to report sexual assaults by reducing a complainant’s fear that “the trial proceedings would veer from an impartial examination of the accused’s conduct on the date in question and instead take on aspects of an inquisition in which complainant would be required to acknowledge and justify her sexual past.” People v Arenda, 416 Mich 1, 9 (1982), quoting People v Khan, 80 Mich App 605, 614 (1978) (quotation marks and citation omitted).

 See, e.g., In re Michael, 119 Ohio App 3d 112, 121 (1997) (“Although evidence of [the male victim’s] prior sexual abuse would intrude on an intimate detail of his personal life, such intrusion was not to harass, degrade, or embarrass him, or to generally attack his credibility by implying that he was immoral or unchaste.”).

 See Hackett, supra at 353-354 (affirming the trial court’s decision to prohibit the defendant from trying to establish a victim’s consent by introducing a previous instance in which she had met a man at a bar and left with him for consensual relations).

 As a result, it is unnecessary to address defendant’s constitutional argument regarding his Sixth Amendment right to confrontation.

 See, e.g., Buttrey, Michigan’s rape-shield statute and the admissibility of evidence that a child complainant has been previously molested, 16 TM Cooley L R 391, 391-393 (1998) (questioning the logic of allowing a jury to assume that the defendant is the sole source of a complainant’s sexual knowledge where evidence indicates additional sources).

 The following is the relevant exchange between the prosecutor and Dr. Guertin:
Q: Okay. And without going into what history it is that she gave or what allegations she made, if you will, what was your finding?
A: The child gave a histoiy. The history was significant in my opinion. The examination was normal. The examination based on her history would be expected to be normal, and it was my impression based on the contents of the history that she likely had been fondled.

 The concurring justice suggests that defendant could have defended against the jury’s incomplete knowledge of DW’s history by questioning Dr. Guertin about the “causal relationship between [his] conclusion and the abuse that defendant was charged with committing.” Ante at 1052 n 40. Such questioning, of course, would still have left the jury in the dark about any alternative source of abuse and, even more problematically, the jury may well have assumed, to the further detriment of defendant, that DW’s history included additional abuse by defendant for which he had previously been charged.